1
2
3
4
5
6
7

FILED
CLERK, U.S. DISTRICT COURT

4/28/2022

CENTRAL DISTRICT OF CALIFORNIA
BY:        JB        DEPUTY

8          UNITED STATES DISTRICT COURT

9      FOR THE CENTRAL DISTRICT OF CALIFORNIA

10          March 2022 Grand Jury

11  UNITED STATES OF AMERICA,            CR   8:22-cr-00056-PA

12          Plaintiff,                   I N D I C T M E N T

13          v.                           [18 U.S.C. § 1349: Conspiracy to
                                         Commit Wire Fraud; 18 U.S.C.
14  MICHAEL MCDONAGH,                    § 1343: Wire Fraud; 18 U.S.C.
    ANTONIO DUARTE,                      § 2326(2): Telemarketing Fraud
15  CHRISTOPHER JAMES VANNOY,            Against the Elderly; 18 U.S.C.
      aka "Chris James,"                 § 2328(a): Criminal Forfeiture]
16  FRANK ANTHONY MOLINA,
      aka "Anthony Molina," and
17  RUBEN ORTIZ,

18          Defendants.

19

20      The Grand Jury charges:

21                  INTRODUCTORY ALLEGATIONS

22      At times relevant to this Indictment:

23      1.   Defendants MICHAEL MCDONAGH, ANTONIO DUARTE, CHRISTOPHER

24  JAMES VANNOY, also known as ("aka") "Chris James," FRANK ANTHONY

25  MOLINA, aka "Anthony Molina," and RUBEN ORTIZ resided within the

26  Central District of California.

27      2.   Defendant MCDONAGH controlled Global Transfer, Inc.

28  ("Global Transfer"), a telemarketing company that operated in the

Central District of California from at least August 2015 until defendant MCDONAGH dissolved the company in or around February 2016.

3.   Defendant MCDONAGH controlled Global Transfer SoCal, Inc. ("GTS"), a telemarketing company that operated in the Central District of California from at least in or around December 2015.

4.   Defendant MCDONAGH controlled Nationwide Transfer, Inc. ("NT"), a telemarketing company that operated in the Central District of California from at least in or around July 2017.

5.   Defendant MCDONAGH caused the formation of Nationwide Exit Specialist, Inc. ("NES"), a telemarketing company that was created around August 2017 and started operating in the Central District of California from at least in or around April 2018.  Once NES began business operations, defendant ORTIZ had authority over NES's business operations as the chief executive officer, chief financial officer, and sole director of the company.

6.   Global Transfer, GTS, NT, and NES are collectively referred to as the "Telemarketing Companies."  The Telemarketing Companies purported to offer services to assist customers who wanted to terminate and/or rescind their ownership interest in timeshare properties.

7.   Defendants DUARTE, VANNOY, MOLINA, and ORTIZ, and co-conspirator Darrick Robert Morrell, worked at one or more of the Telemarketing Companies.

8.   DocuSign, Inc. ("DocuSign") was an electronic signature technology company that the Telemarketing Companies used to digitally transfer contracts to customers to solicit the customers' electronic signatures.  DocuSign maintained servers outside of California, and thus any time a document was transferred from one person to another

using DocuSign's software, DocuSign would cause the document to be transmitted by means of wire communication to servers outside of California.

9.    These Introductory Allegations are incorporated into each Count of this Indictment.

COUNT ONE

[18 U.S.C. §§ 1349, 2326(2)]

[ALL DEFENDANTS]

A.  OBJECT OF THE CONSPIRACY

10.  Beginning no later than in or about 2015 and continuing through on or about May 16, 2019, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendants MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ knowingly conspired with each other and others known and unknown to the Grand Jury to commit wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with the conduct of telemarketing and email marketing, as defined in Title 18, United States Code, Section 2325, and, in so doing, victimized ten or more persons over the age of 55.

B.  THE MANNER AND MEANS OF THE CONSPIRACY

11.  The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

a.  Defendant MCDONAGH would register and assist in registering the Telemarketing Companies with the California Secretary of State.

b.  At the direction of MCDONAGH and other co-conspirators, employees of the Telemarketing Companies, referred to as "openers," would contact potential victims who were timeshare owners and offer to help them terminate their timeshare interest for a fixed fee.  If the timeshare owner expressed possible interest in the Telemarketing Companies' services, the openers would transfer the call to a "closer" working for one of the Telemarketing Companies.

4

1         c.   Upon receiving a transferred call from an opener,

2    defendants MCDONAGH, DUARTE, VANNOY, and MOLINA, and other co-

3    conspirators, would convince victims to enter into contracts with the

4    Telemarketing Companies by falsely representing that the

5    Telemarketing Companies would get the victim out of their timeshare

6    interest for a "one time" fee, that the Telemarketing Companies'

7    services came with a refundable money-back guarantee, and that the

8    Telemarketing Companies had a high success rate in obtaining large

9    restitution and other payments from timeshare companies.

10        d.   Defendants DUARTE, VANNOY, and MOLINA, and other co-

11   conspirators, would, within weeks of a victim paying the purported

12   "one time" fee, contact victims and knowingly make false and

13   fraudulent statements, representations, and promises for the purpose

14   of inducing the victims to send more money to the Telemarketing

15   Companies, which the co-conspirators referred to as "upgrade"

16   payments, including that:

17          i.   if the victim paid an additional fee to the

18   Telemarketing Companies, the Telemarketing Companies would secure a

19   large "settlement" payment for the victim based on a purported

20   ongoing class action lawsuit or other litigation against the victim's

21   timeshare company;

22          ii.  if the victim paid an additional fee to the

23   Telemarketing Companies, the Telemarketing Companies would secure a

24   large "restitution" payment from the victim's timeshare company

25   because the timeshare company had purportedly rented out the victim's

26   timeshare property without the victim's permission;

27

28

iii.  the additional fee being requested would be refunded to the victim once the victim's timeshare company paid the settlement and/or restitution payment; and

iv.  the victim could not communicate with their timeshare company, including inquiries related to the "restitution" and/or "settlement" payments the victim would purportedly receive because the victim's timeshare company required the victim to sign a non-disclosure agreement ("Fraudulent NDA").

e.  In fact, as defendants MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ then knew:

i.  the co-conspirators did not know of any class action lawsuit or conduct by the victims' timeshare companies that would result in large settlement or restitution payments to the victims;

ii.  the victims' timeshare companies would not negotiate with employees of the Telemarketing Companies, and thus the Telemarketing Companies could not secure settlement or restitution payments for the victims;

iii. the victims' timeshare companies did not agree to pay large restitution or settlement payments to the victims; and

iv.  the victims' timeshare companies did not require the victims to sign the Fraudulent NDAs, but rather, the Telemarketing Companies used the Fraudulent NDAs to prevent the victims from contacting the timeshare companies to inquire about the purported settlement and/or restitution payments, which would reveal the Telemarketing Companies' fraud.

f.  Defendants MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ, and others at their direction, would omit and conceal material

6

facts from the victims, including the fact that none of the upgrade payments sought by the Telemarketing Companies were used for the purpose of obtaining restitution or settlement payments from the timeshare companies, but were rather used for the purpose of personally enriching defendants MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ.

g.   Defendant MCDONAGH would instruct employees of the Telemarketing Companies to "take no prisoners," have "no remorse" when interacting with victims, and to "take every penny you can from" the victims "so they cannot sue" the Telemarketing Companies.

h.   Defendant MCDONAGH and others would instruct employees of the Telemarketing Companies to alter customer files and destroy evidence related to upgrade payments received by the Telemarketing Companies to conceal their fraud.

i.   The co-conspirators would cause victims' timeshare company ownership interests to be transferred to individuals who had no intention of making payments to the timeshare companies or otherwise fulfill the obligations of a timeshare transferee, including Individual 1 and Individual 2.

j.   To give the Telemarketing Companies the appearance of legitimacy, and to induce the victims into paying the Telemarketing Companies money, defendant MCDONAGH and other co-conspirators would direct Telemarketing Companies' employees to create fake positive reviews on various websites, including the Telemarketing Companies' profiles on the Better Business Bureau ("BBB's") website.

k.   Defendants MCDONAGH and ORTIZ would create and/or operate new telemarketing companies after victims lodged complaints with the BBB, consumer protection agencies, and/or law enforcement

agencies about being defrauded by the existing telemarketing company, namely GTS.

l.   Through this conspiracy, defendants MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ, and other co-conspirators fraudulently obtained more than $5 million from victims.

C.   <u>OVERT ACTS</u>

12.   In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

<u>Creation of Global Transfer, GTS, NT, and NES</u>

<u>Overt Act No. 1:</u>   On August 20, 2015, defendant MCDONAGH caused articles of incorporation for Global Transfer to be filed with the California Secretary of State.

<u>Overt Act No. 2:</u>   On December 28, 2015, defendant MCDONAGH caused articles of incorporation for GTS to be filed with the California Secretary of State.

<u>Overt Act No. 3:</u>   On July 10, 2017, defendant MCDONAGH caused articles of incorporation for NT to be filed with the California Secretary of State.

<u>Overt Act No. 4:</u>   On August 1, 2017, defendant MCDONAGH caused articles of incorporation for NES to be filed with the California Secretary of State.

<u>Overt Act No. 5:</u>   On February 26, 2018, defendant ORTIZ opened a Bank of America, N.A. bank account ending in 1551 for NES.

1    Overt Act No. 6:    On February 26, 2018, defendant ORTIZ opened
2    a Citibank bank account ending in 1448 for NES.

3    Overt Act No. 7:    On March 16, 2018, defendants ORTIZ and
4    VANNOY added defendant VANNOY as a signatory to the NES's Bank of
5    America, N.A. account ending in 1551.

6    Overt Act No. 8:    On April 9, 2018, defendant MCDONAGH sent
7    documents by email to a payment processing company to help set up an
8    account for NES.

9    Overt Act No. 9:    On May 7, 2018, defendant MCDONAGH sent an
10   email to a payment processing company asking it to set up an account
11   for NES, attaching a blank check from NES's Bank of America account
12   ending in 1551.

13   Overt Acts Relating to Specific Victims

14       **Victim K.M.**

15   Overt Act No. 10:    In March 2016, co-conspirator Darrick Robert
16   Morrell called victim K.M. on the telephone and solicited money from
17   victim K.M. based on the fraudulent representations that K.M.'s
18   timeshare company had illegally rented out K.M.'s timeshare unit and
19   had offered to pay victim K.M. a settlement of approximately $27,000,
20   and that GTS would help K.M. receive this purported settlement if
21   K.M. paid GTS.

22       **Victim C.R.**

23   Overt Act No. 11:    On January 9, 2017, defendant DUARTE sent
24   victim C.R. an email soliciting a "one time" fee of $5,500 that
25   falsely represented, among other things, that GTS's services were
26   backed by a purported 180-day money back guarantee.

27   Overt Act No. 12:    On January 19, 2017, a co-conspirator caused
28   an upgrade contract to be sent by email to victim C.R. that solicited

9

an additional service fee of $3,500 for the "dispute of ownership of the restitution of $105,000.00."

Overt Act No. 13:   On March 13, 2017, defendant DUARTE sent victim C.R. an email falsely stating, "As we just discussed we are working on your dispute of ownership and in need of the fees that were mentioned to expedite the process and bring a resolve to this matter.  The negotiation amount of the $192,582.86 has been established.  The $17,895.00 is the last payment needed and there will be no additional incurred costs beyond this point."

Overt Act No. 14:   On July 17, 2017, defendant DUARTE sent victim C.R. an email soliciting an additional fee of $16,918.71 and falsely stating, "[p]er our conversation on 7/17/2017 Diamond Resort has agreed to the terms set forth for the disbursement of the restitution of $225,582.86 for the violation of several consumer protection laws."

Overt Act No. 15:   On December 1, 2017, in a text message conversation, defendant MCDONAGH and co-conspirator Morrell discussed soliciting money from victim C.R.  During the conversation, co-conspirator Morrell stated that "me and [defendant VANNOY] and [defendant DUARTE] had a[n] agreement about [victim C.R.]. That if she was ever hit, we would all be a part of it."

**Victim C.M.W.**

Overt Act No. 16:   On January 13, 2017, a GTS employee called victim C.M.W. and solicited money based on the fraudulent representation that victim C.M.W.'s timeshare had illegally rented her timeshare unit and therefore owed victim C.M.W. over $34,000 in restitution.

Overt Act No. 17:   On January 13, 2017, using DocuSign software, a GTS employee sent an upgrade contract to victim C.M.W. soliciting a service fee related to restitution that C.M.W. was purportedly owed.

Overt Act No. 18:   On May 22, 2017, defendant DUARTE sent an email to victim C.M.W. to solicit an additional $6,725 based on the fraudulent representation that victim C.M.W. would receive $82,225.67 in restitution from victim C.M.W.'s timeshare company. In the email, defendant DUARTE further falsely stated that "this entire process is guaranteed until your case is resolved."

**Victim R.G.**

Overt Act No. 19:   On or before March 13, 2017, a co-conspirator spoke with victim R.G. on the telephone and falsely represented to victim R.G. that he would receive a substantial restitution payment.

Overt Act No. 20:   On March 13, 2017, an employee of GTS transmitted an upgrade contract to victim R.G. that solicited a service fee of $4,695 purportedly for the "dispute of ownership for the restitution of $61,426.00."

Overt Act No. 21:   On March 20, 2017, defendant VANNOY sent victim R.G. an email that falsely stated that GTS's services came with a "%100 Money Back Guarantee!!!".

Overt Act No. 22:   On March 20, 2017, using DocuSign software, an employee of GTS sent an upgrade contract to victim R.G. that solicited a service fee of $2,347.50 purportedly related to restitution victim R.G. would receive from his timeshare company.

Overt Act No. 23:   On or before March 7, 2018, defendant DUARTE sent an email to victim R.G. requesting an additional $4,475 fee and

11

1   falsely representing that victim R.G.'s timeshare company had agreed
2   to pay $66,725.71 in restitution to R.G.  The email further falsely
3   stated, "this entire process is guaranteed until your case is
4   resolved" and "this fee will be a fully reimbursed fee back by your
5   ownership."

6      **Victim D.P.**

7      <u>Overt Act No. 24:</u>   On April 5, 2017, defendant VANNOY and other
8   co-conspirators called victim D.P. on the telephone to solicit $7,098
9   based, in part, on the false representation that victim D.P.'s
10  timeshare company would pay D.P. approximately $74,000 in
11  restitution.

12     <u>Overt Act No. 25:</u>   On May 3, 2017, defendant VANNOY and co-
13  conspirator Morrell called victim D.P. to solicit an additional
14  $5,500 for purported "legal costs."  During the phone call, defendant
15  VANNOY falsely stated that he was a member of GTS's "legal team" and
16  that he had traveled to victim D.P's timeshare company to complete
17  settlement negotiations.

18     <u>Overt Act No. 26:</u>   On May 3, 2017, a co-conspirator caused an
19  upgrade contract to be sent by email to victim D.P. that solicited a
20  service fee of $5,500 for the "dispute of ownership for the
21  restitution of $89,527.00."

22     **Victim L.K.**

23     <u>Overt Act No. 27:</u>   On May 2, 2017, defendant VANNOY sent victim
24  L.K. an email fraudulently representing GTS would relieve victim L.K.
25  of her timeshare interest and secure a refund from the timeshare
26  company.  The email falsely stated, among other things, that GTS has
27  a "high success rate in assisting our clients to recover funds from

28

their resorts on the grounds of illegal and misrepresented sales practices[.]"

Overt Act No. 28:   On June 30, 2017, defendant VANNOY sent an email to victim L.K. falsely stating, "Per our conversation on 6/30/17 I have attached the document confirming you will be receiving $29,832 plus a refundable payment of $3,668.  Our firm here [a]t Global Transfer SoCal stands behind our agreement 100% and will continue to offer our full money back guarantee if for ANY REASON the claim is not finalized we will refund all payments made to our firm in there entirety."

Overt Act No. 29:   On July 21, 2017, defendant DUARTE sent an email to victim L.K. to solicit an additional fee based on the following fraudulent representations: "I am following up on the conversation we had regarding the dispute of ownership case that we are following with you Resort and the agreed upon amount of $29,832.67 for restitution that has been confirmed.  Also as mentioned the fee of $5995.00 is your last incurred cost in this entire process.  I want to assure you that this entire process is guaranteed until your case is resolved.  As mentioned this fee will be a fully reimbursed fee back by your ownership.  As discussed within the next two weeks this entire process will be concluded."

Overt Act No. 30:   On July 21, 2017, using DocuSign software, a GTS employee sent an upgrade contract to victim L.K. soliciting a service fee related to the purported restitution that victim L.K. would receive from her timeshare company.

**Victim M.A.**

Overt Act No. 31:   On June 1, 2017, defendant DUARTE sent an email to victim M.A. requesting a fee of $4,850 related to "the

restitution in the amount of $125,525.71." Defendant DUARTE further falsely stated that the requested fee would be the "last incurred cost regarding this process (GUARANTEED)" and "[w]e are in the final steps of finalizing your case as I explained" during an earlier telephone call.

Overt Act No. 32:   On June 2, 2017, using DocuSign software, defendant DUARTE caused a GTS employee to send an upgrade contract to victim M.A. that solicited a service fee related to the restitution that victim M.A. would purportedly receive from her timeshare company.

Overt Act No. 33:   On June 9, 2017, using DocuSign software, a GTS employee sent an upgrade contract to victim M.A. soliciting another service fee related to the restitution that victim M.A. would purportedly receive from her timeshare company.

**Victim L.L.**

Overt Act No. 34:   On September 13, 2017, defendant VANNOY sent an email to victim L.L. that falsely represented that victim L.L.'s timeshare company would pay L.L. approximately $32,681 in restitution plus $8,168 to reimburse victim L.L. for the fees she had paid to GTS.  The email also stated, "I wanted to send you this email as reinsurance that Global Transfer stands behind what we say."

Overt Act No. 35:   On October 11, 2017, defendant VANNOY sent an email to victim L.L. that falsely stated that victim L.L. would receive $32,681 in restitution from her timeshare and would be reimbursed for $11,048 in payments she had previously made to GTS.

Overt Act No. 36:   On February 20, 2018, defendant VANNOY sent an email to victim L.L. that falsely represented that victim L.L.'s

timeshare company would pay L.L. over $70,000 in restitution and GTS would reimburse L.L. for the money she had paid to GTS.

**Victim D.M.**

Overt Act No. 37:   On November 9, 2017, defendant VANNOY called victim D.M. to solicit a service fee based on fraudulent representations, including that victim D.M.'s timeshare company offered him a settlement payment of approximately $23,845.

Overt Act No. 38:   On November 9, 2017, one or more co-conspirators caused victim D.M.'s timeshare property interest to be transferred to Individual 1.

Overt Act No. 39:   On January 25, 2018, defendant VANNOY sent an email to victim D.M. to solicit an additional fee of $4,500, which falsely stated, "I am sending you this email to outline our process in concluding our case with [the timeshare].  The total amount of compensation we are pursuing is for $55,335 which includes a reimbursement check of $16,799 for filing and legal expenses incurred throughout this transfer process."

**Victim C.I.**

Overt Act No. 40:   On February 7, 2018, defendant DUARTE caused an email to be sent to victim C.I. to solicit a fee of $7,775 and which falsely stated that NT was "concluding your dispute of ownership with your timeshare," that the "$7775.00 is the last incurred fee associated with the process," and that "if we are not successful with the case we would refund the funds in their entirety that you have paid our firm."

Overt Act No. 41:   On August 15, 2018, an NT employee caused the transmission of a Fraudulent NDA to victim C.I.

Overt Act No. 42:   On February 28, 2019, in text messages, defendant DUARTE told co-conspirator Morrell that victim C.I. was a "huge client" and that defendant DUARTE had instructed defendant MOLINA to stay in touch with victim C.I.

Overt Act No. 43:   On March 27, 2019, defendant DUARTE called victim C.I. to solicit a service fee based on a fraudulent representation that he would receive restitution from his timeshare company.

**Victim J.S.**

Overt Act No. 44:   On or before April 5, 2018, an NT employee caused the transmission of a contract to victim J.S. and solicited a service fee related to "restitution of $29,482.65."

Overt Act No. 45:   On or before September 9, 2018, an NT employee caused the transmission of a Fraudulent NDA to victim J.S. that falsely stated victim J.S. was entitled to "an estimated $41,991" in restitution from victim J.S.'s timeshare company.

Overt Act No. 46:   On October 22, 2018, an NT employee ("NT Employee 1") executed a document transferring the title of victim J.S.'s timeshare ownership interest into NT Employee 1's name.

Overt Act No. 47:   On April 3, 2019, in text messages, co-conspirator Morrell reported to defendant DUARTE that victim J.S. broke down crying when he and defendant MOLINA asked her for more money.

**Victim B.W.**

Overt Act No. 48:   On June 20, 2018, in a text message, co-conspirator Morrell told defendant DUARTE that the "[l]ast settlement I have for" victim B.W. "was 45,472.86" and that "it's probably higher than that now."

16

Overt Act No. 49:   On June 21, 2018, using DocuSign software, a GTS employee sent an upgrade contract to victim B.W. soliciting a service fee related to the purported restitution that victim B.W. would receive from her timeshare company.

Overt Act No. 50:   On December 10, 2018, during a phone call with victim B.W. in which she demanded a refund of the money she paid NT, defendant MOLINA falsely stated that "we have a settlement coming your way" from victim B.W.'s timeshare company.

Overt Act No. 51:   On December 10, 2018, during a phone call with victim B.W. in which she demanded a refund of the money she paid to NT, defendant DUARTE falsely stated that he and other NT employees had evidence of the work they performed for victim B.W. that justified the money NT received.   Defendant DUARTE also falsely told victim B.W. that NT had transferred the property to Individual 1.

**Victim E.H.**

Overt Act No. 52:   On August 1, 2018, defendant VANNOY sent victim E.H. an email seeking a fee of $1,500 and falsely stated that it was a "one-time fee" to cover NES's "complete dissolution of your deed with your resort" and that NES has "a high success rate in assisting our clients to recover funds from their resorts" because of the resorts illegal sales practices.

**Victim T.W.**

Overt Act No. 53:   On September 25, 2018, an NES employee sent an email to victim T.W. that falsely stated that NES could relieve T.W. of his timeshare obligations for a "onetime fee" and that NES has "a high success rate in assisting our clients to recover funds from their resorts" because of the resorts illegal sales practices.
///

**Victims J.P. and C.P.**

Overt Act No. 54:   On October 29, 2018, using DocuSign software, an NES employee sent an upgrade contract to victim C.P. soliciting a service fee purportedly related to the restitution that victims J.P. and C.P. would receive from their timeshare company.

Overt Act No. 55:   On January 28, 2019, one or more co-conspirators caused Individual 2 to sign a document transferring victims J.P. and C.P.'s timeshare ownership into his name.

**Victim R.J.**

Overt Act No. 56:   On November 15, 2018, defendant MOLINA called victim R.J. on the telephone to solicit a fee of approximately $4,895 based on a fraudulent representation regarding fabricated closing costs.

**Victim T.C.**

Overt Act No. 57:   On December 19, 2018, defendant VANNOY sent an email to victim T.C. soliciting a service fee of $6,884 and falsely stated that NES could pursue a case against victim T.C.'s timeshare because NES's investigation revealed "evidence of a securities violation, Double backing (unauthorized rental), as well as an unauthorized release of personal information."  In the email, defendant VANNOY represented that in lieu "of pursuing legal action on these violations we have an opportunity to pursue restitution (pay out) in the amount of 43,552 on the premise that we surrender the [victim T.C.'s timeshare] ownership back to the resort and Sign a standard non-disclosure agreement."  Defendant VANNOY told victim T.C. the cost to pursue this action was $6,884.

Overt Act No. 58:   On December 20, 2018, an NES representative sent victim T.C. an email falsely stated that "the amount of

restitution we are pursuing for the Securities Violation & deceptive sales tactics is 23,684 and the cost to pursue is $3,597. The second restitution case we are pursuing is for predatory lending and double backing (unauthorized rental) for 19,868 and the cost to pursue is $3,287."

**Victim C.C.W.**

Overt Act No. 59:   On January 28, 2019, defendant MOLINA and co-conspirator Morrell called victim C.C.W. on the telephone to solicit a service fee based on a fraudulent representation that C.C.W. would receive a substantial payment from his timeshare company.

**Victim D.W.**

Overt Act No. 60:   On April 17, 2019, co-conspirator Morrell called victim D.W. on the telephone to solicit a service fee based on a fraudulent representation that NT had received a settlement offer of $69,000 from D.W.'s timeshare company.

Overt Act No. 61:   On May 6, 2019, co-conspirator Morrell called victim D.W. on the telephone to solicit a service fee based on the fraudulent representation that the offer of restitution from victim D.W.'s timeshare would increase if he paid the service fee.

Overt Act No. 62:   On May 16, 2019, defendant MOLINA and co-conspirator Morrell called victim D.W. on the telephone and solicited money from victim D.W. based on the fraudulent representation that defendant MOLINA was at victim D.W.'s timeshare company to complete a settlement with victim D.W.'s timeshare company and that D.W. could join a class action lawsuit against D.W.'s timeshare company for a fee.

///

General Operation and Concealment of the Fraud Scheme

Overt Act No. 63:   On September 28, 2017, defendant MCDONAGH sent an email to defendant ORTIZ with "leads," that is, a list of individuals owning timeshares and their contact information. Defendant MCDONAGH instructed defendant ORTIZ to distribute these "leads" to the GTS employees.

Overt Act No. 64:   On May 25, 2018, in text messages, defendant MCDONAGH pressured co-conspirator Morrell to close $15,000 in deals.

Overt Act No. 65:   On May 25, 2018, in response to the text messages described in Overt Act No. 64, co-conspirator Morrell sent a text message to defendant MCDONAGH stating, "I'll call my whales[.]"

Overt Act No. 66:   On May 25, 2018, in response to the text message referenced in Overt Act No. 65, defendant MCDONAGH sent a text message to co-conspirator Morrell stating, "Ok well pressures on bro[.]"

Overt Act No. 67:   On July 12, 2018, defendant MCDONAGH caused the transfer of $165 from NT's Bank of America account to C.C. as payment for Individual 1 agreeing to have a victim's timeshare ownership transferred into her name.

Overt Act No. 68:   On August 13, 2018, in text messages, defendant VANNOY and co-conspirator Morrell discussed limiting the amount of money solicited from victims to conceal their fraudulent scheme.  In those texts, defendant VANNOY stated that he did not charge over $10,000 for upgrades, did not like clients "pay[ing] astronomical amounts," and would not permit a client to pay over 50,000 in total. Defendant VANNOY added that "I don't send out emails and I won't give them anything like incriminating us."

1     <u>Overt Act No. 69:</u>   On August 29, 2018, in text messages, co-
2 conspirator Morrell asked defendant MCDONAGH, "I have a client that
3 is a sheriff [in Ohio], tony thinks its okay to upg him.  What do
4 yout think?"  After defendant MCDONAGH responded that it "should be
5 fine," co-conspirator Morrell stated, "I just think hitting the
6 lawyer and cop is asking for trouble."

7     <u>Overt Act No. 70:</u>   On August 29, 2018, in response to the text
8 message inquiry from co-conspirator Morrell referenced in Overt Act
9 No. 69, defendant MCDONAGH sent a text message to co-conspirator
10 Morrell stating, "[o]k then back off don't [do] the cop then."

11     <u>Overt Act No. 71:</u>   On October 22, 2018, defendant MCDONAGH
12 caused the issuance of a $330 check drawn on NT's Bank of America
13 account payable to NT Employee 1 as payment for NT Employee 1
14 agreeing to have a victim's timeshare ownership transferred into his
15 name.

16     <u>Overt Act No. 72:</u>   On December 12, 2018, in text messages, in
17 response to Individual 2's complaints about not having enough money
18 to cover his rent, defendant ORTIZ suggested that Individual 2 make
19 additional money by transferring more victim timeshares into
20 Individual 2's name.

21     <u>Overt Act No. 73:</u>   On December 13, 2018, in text messages
22 discussing fraudulent upgrade payments, defendant MCDONAGH told co-
23 conspirator Morrell that he would set guidelines for upgrade payments
24 because defendant MCDONAGH was "taking a lot of risk and some times
25 not even getting pai[d]."

26     <u>Overt Act No. 74:</u>   On December 17, 2018, an NES employee wrote
27 a $300 check drawn on NES's Bank of America account to Individual 2
28 as payment for transferring timeshare ownership(s) into his name.

Overt Act No. 75:   On January 5, 2019, in text messages with co-conspirator Morrell and defendants DUARTE and MOLINA about ways to minimize risk of their fraudulent scheme being revealed, defendant MCDONAGH provided a new "structure" to NT closers that permitted closers to do two upgrades per week "no questions asked" but limited the amount charged to any "client" no matter "how big a whale" to $50,000.

Overt Act No. 76:   On January 5, 2019, in response to the text messages sent by defendant MCDONAGH referenced in Overt Act No. 75, defendants DUARTE and MOLINA confirmed in text messages that they agreed with defendant MCDONAGH's new approach concerning fraudulent upgrade payments in order to minimize risk of their fraudulent scheme being revealed.

Overt Act No. 77:   On January 7, 2019, in text messages, after co-conspirator Morrell told defendant VANNOY he was worried about a possible criminal investigation based on their fraudulent activities, defendant VANNOY stated the worst victims could do is "sue" co-conspirator Morrell for "elderly abuse" and that defendant VANNOY thought the maximum criminal penalty was a $1,000 fine or a year in county jail.

Overt Act No. 78:   On January 7, 2019, in text messages, co-conspirator Morrell asked defendant VANNOY if defendant VANNOY was concerned about victim C.R. and her allegation that company employees engaged in criminal "racketeering".

Overt Act No. 79:   On January 7, 2019, in text messages, defendant VANNOY told co-conspirator Morrell, "Well they're stupid and don't know what racketeering is LOL" and suggested that co-conspirator Morrell and NT should not "hit people so hard."

22

Overt Act No. 80:   On January 7, 2019, in text messages, after learning that the California Department of Real Estate was investigating their telemarketing operations, defendant DUARTE and co-conspirator Morrell agreed to continue destroying victim files.

Overt Act No. 81:   On January 7, 2019, in text messages, in response to their discussion about the legal consequences for "elder abuse," "racketeering," and "wire fraud[,] mail fraud[,] gross negligence[,] and dishonesty", defendant VANNOY and co-conspirator Morrell discussed a strategy to limit the total amount of upgrade payments to "[n]othing more than 50k."

Overt Act No. 82:   On January 9, 2019, in text messages, co-conspirator Morrell told defendant MCDONAGH that he agreed the co-conspirators needed more money but stated he was afraid "to hit our big whales" since they could cause "more problems."

Overt Act No. 83:   On January 9, 2019, in text messages with co-conspirator Morrell, defendant MCDONAGH directed that defendant DUARTE and co-conspirator Morrell could use the word "settlement" in an email to a victim so long as it did not contain "numbers."

Overt Act No. 84:   On January 30, 2019, via text messages, defendant DUARTE told co-conspirator Morrell that "[s]omehow they connected all of us[,]" exclaimed "Fuk," and then sent co-conspirator Morrell screenshots of reviews that clients had posted on various websites that included specific references to defendant DUARTE and co-conspirator Morrell .

Overt Act No. 85:   On January 31, 2019, in text messages, defendant VANNOY provided co-conspirator Morrell the name of the website he used to delete bad BBB reviews of NES so that co-

conspirator Morrell could use the website to delete bad reviews of NT.

Overt Act No. 86:   On February 26, 2019, in text messages responding to co-conspirator Morrell's complaints that NT had "problem clients everywhere. They keep calling the resort", defendant MCDONAGH instructed co-conspirator Morrell to change NT's contract language to prevent future victims from contacting their timeshare resorts.

Overt Act No. 87:   On March 7, 2019, in text messages responding to co-conspirator Morrell's complaint that he had lost deals because NT did not have enough positive reviews on a website, defendant MCDONAGH told co-conspirator Morrell that he instructed an NT employee to do "what Chris [defendant VANNOY] does" to "blocks bad reviews" and "put[] up good ones."

Overt Act No. 88:   On March 7, 2019, in text messages, defendant MCDONAGH instructed an NT employee to contact defendant VANNOY and "figure how he does the thing we're he can block bad reviews on line and put up good ones please."

Overt Act No. 89:   On March 13, 2019, in text messages responding to co-conspirator Morrell's request to have more people write fake positive reviews of NT on the BBB website, defendant MCDONAGH told an NES employee to write a false, positive review of NT on the BBB website.

Overt Act No. 90:   On March 14, 2019, defendant MCDONAGH sent a text message to co-conspirator Morrell asking whether co-conspirator Morrell had "everyone create an email" address so they could create fake positive reviews for NT.

Overt Act No. 91:   On March 19, 2019, in a text message responding to co-conspirator Morrell's request to "flood [the Better Business Bureau] ... with positive reviews," defendant MCDONAGH confirmed that he would do so.

Overt Act No. 92:   On April 1, 2019, in text messages responding to defendant ORTIZ's complaints about not making enough money and his concern with the risk he was taking having NES in his name, defendant MCDONAGH told defendant ORTIZ he was making $6,000 per month.

Overt Act No. 93:   On April 1, 2019, in text messages, defendant ORTIZ agreed with defendant MCDONAGH that he was receiving "good money" and stated that he "hoped in the long run when" NES is "done" that defendant ORTIZ would not be "stuck with all the blowback" and "[y]ou either owe money for the rest of ur life or u go to prison."

Overt Act No. 94:   On April 1, 2019, in text messages, defendant MCDONAGH told defendant ORTIZ that "it's def a risk but I mean I shut down global over a year ago and nothing! 'Knock on wood' but I mean it's a decision you personally have to make ive made piece with it ive been a criminal my whole life and now it's actually benefiting me[.]"

Overt Act No. 95:   On May 8, 2019, in text messages, defendant MCDONAGH and co-conspirator Morrell discussed the need to have BBB stop rejecting their fake positive reviews for NT and having NT employees go to the library to use a different an internet protocol address in order to more successfully post multiple fake positive reviews.  Defendant MCDONAGH also told co-conspirator Morrell to

offer his employees a small cash reward for every two fake positive
reviews for NT the employees wrote.

COUNTS TWO THROUGH TWENTY-NINE

[18 U.S.C. §§ 1343, 2326(2), 2(a)]

[ALL DEFENDANTS]

A.   SCHEME TO DEFRAUD

13.   Beginning no later than in or about 2015 and continuing through on or about May 16, 2019, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendants MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud people holding timeshare property interests (the "victims") as to material matters, and to obtain moneys, funds, assets, and other property owned by and in the custody and control of the victims by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts, in connection with the conduct of telemarketing and email marketing, as defined in Title 18, United States Code, Section 2325, and, in so doing, victimized ten or more persons over the age of 55.

14.   The fraudulent scheme operated and was carried out, in substance, as described in Paragraph 11 of this Indictment, which is incorporated here.

B.   USE OF THE WIRES

15.   On or about the dates set forth below, within the Central District of California, and elsewhere, defendants MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communication in interstate commerce:

| COUNT | DATE | DEFENDANTS | WIRE |
|---|---|---|---|
| TWO | May 2, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email solicitation from defendant VANNOY in California, to victim L.K. in New Hampshire. |
| THREE | May 3, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Telephone solicitation from defendant VANNOY and co-schemer Morrell from California to victim D.P. in New York. |
| FOUR | May 3, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Transmission of upgrade contract via DocuSign from a GTS employee in California to victim D.P. in New York. |
| FIVE | May 22, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email solicitation from defendant DUARTE in California to victim C.M.W. in Minnesota. |
| SIX | June 1, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email solicitation from defendant DUARTE in California to victim M.A. in Massachusetts. |
| SEVEN | June 2, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Transmission of upgrade contract via DocuSign from a GTS employee in California to victim M.A. in Massachusetts. |
| EIGHT | June 9, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Transmission of upgrade contract via DocuSign from a GTS employee in California to victim M.A. in Massachusetts. |
| NINE | June 30, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email from defendant VANNOY in California to victim L.K in New Hampshire. |
| TEN | July 17, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email solicitation from defendant DUARTE in California to victim C.R. in Arizona. |
| ELEVEN | July 21, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email from defendant DUARTE in California to victim L.K. in New Hampshire. |
| TWELVE | September 13, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email from defendant VANNOY in California to victim L.L. in Missouri. |

| COUNT | DATE | DEFENDANTS | WIRE |
|---|---|---|---|
| THIRTEEN | October 11, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email from defendant VANNOY in California to victim L.L. in Missouri. |
| FOURTEEN | November 9, 2017 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Transmission of upgrade contract via DocuSign from a GTS employee in California to victim D.M. in Nevada. |
| FIFTEEN | January 25, 2018 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email solicitation from defendant VANNOY in California to victim D.M. in Nevada. |
| SIXTEEN | February 7, 2018 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email solicitation from defendant DUARTE in California to victim C.I. in Texas. |
| SEVENTEEN | February 20, 2018 | MCDONAGH, DUARTE, VANNOY, and MOLINA | Email from defendant VANNOY in California to victim L.L. in Missouri. |
| EIGHTEEN | March 7, 2018 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Email solicitation from defendant DUARTE in California to victim R.G. in Oklahoma. |
| NINETEEN | April 5, 2018 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Transmission of upgrade contract via DocuSign from an NT employee in California to victim J.S. in Pennsylvania. |
| TWENTY | June 21, 2018 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Transmission of upgrade contract via DocuSign from an NT employee in California to victim B.W. in California. |
| TWENTY-ONE | September 21, 2018 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Transmission of upgrade contract via DocuSign from an NES employee in California to victim E.H. in California. |
| TWENTY-TWO | October 29, 2018 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Transmission of upgrade contract via DocuSign from an NES employee in California to victims J.P. and C.P. in Nevada. |

| COUNT | DATE | DEFENDANTS | WIRE |
|-------|------|------------|------|
| TWENTY-THREE | November 15, 2018 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Telephone solicitation from defendant MOLINA in California to victim R.J., in Florida. |
| TWENTY-FOUR | December 19, 2018 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Email solicitation from defendant VANNOY in California to victim T.C. in Connecticut. |
| TWENTY-FIVE | December 20, 2018 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Email from an NES employee in California to victim T.C. in Connecticut. |
| TWENTY-SIX | January 28, 2019 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Telephone call from defendant MOLINA and co-conspirator Morrell in California to victim C.C.W. in Virginia. |
| TWENTY-SEVEN | March 27, 2019 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Telephone solicitation from defendant DUARTE in California to victim C.I. in Texas. |
| TWENTY-EIGHT | April 3, 2019 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Telephone solicitation from defendant MOLINA and co-conspirator Morrell in California to victim J.S., in Pennsylvania. |
| TWENTY-NINE | May 16, 2019 | MCDONAGH, DUARTE, VANNOY, MOLINA, and ORTIZ | Telephone solicitation from defendant MOLINA and co-conspirator Morrell in California to victim D.W. in Washington. |

1        FORFEITURE ALLEGATION

2          [18 U.S.C. § 2328(a)]

3    1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given to defendants that the United

5   States will seek forfeiture as part of any sentence in accordance

6   with Title 18, United States Code, Section 2328(a), in the event of

7   any defendant's conviction of the offenses set forth in any of Counts

8   One through Twenty-Nine of this Indictment.

9    2.   Any defendant so convicted shall forfeit to the United

10   States the following:

11        (a) All right, title and interest in any and all property,

12   real or personal, constituting or traceable to gross proceeds

13   obtained as a result of such offense;

14        (b)   All right, title and interest in any and all

15   equipment, software, or other technology used or intended to be used

16   to commit or facilitate the commission of such offense; and

17        (c)   To the extent such property is not available for

18   forfeiture, a sum of money equal to the total value of the property

19   described in subparagraphs (a) and (b).

20    3.   Pursuant to Title 21, United States Code, Section 853(p),

21   as incorporated by Title 18, United States Code, Section 2328(b), any

22   defendant so convicted shall forfeit substitute property, up to the

23   value of the property described in the preceding paragraph if, as the

24   result of any act or omission of said defendant, the property

25   described in the preceding paragraph or any portion thereof (a)

26   cannot be located upon the exercise of due diligence; (b) has been

27   transferred, sold to, or deposited with a third party; (c) has been

28   placed beyond the jurisdiction of the court; (d) has been

31

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

                                        A TRUE BILL


                                        /S/
                                        _____
                                        Foreperson


TRACY L. WILKISON
United States Attorney


SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and
Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption
and Civil Rights Section

THOMAS F. RYBARCZYK
Assistant United States Attorney
Public Corruption and Civil
Rights Section

IAN V. YANNIELLO
Assistant United States Attorney
International Narcotics,
Money Laundering and Racketeering
Section